May it please the court, Perrin Dissner for the appellants, Lovdarts and Davis-Royce. It's an honor to present this case. It's a very exciting case because it's an interesting question at issue. Does the Digital Millennium Copyright Act, which has been applied widely to all kinds of questions of secondary copyright infringement, does that apply to MMS, the digital mobile-to-mobile device messaging system that the carriers have cooperated to create? We submit that it doesn't. There are multiple ways that it doesn't fall under the auspices of DMCA. Primarily, the Digital Millennium Copyright Act, Section 512I, specifies that for qualification, a system must have standard technical measures that the rights holder can access and search the operator's system for infringing content. That's how the Napster plaintiffs found their copyrights on this system being misused, because Napster operates on the database that the infringers use to find the things that they're infringing. The infringees, if you will, the copyright holders, can go to the same database and see, well, my copyright has been infringed here, here, and here. Counsel, what's your showing here that would establish that AT&T had the ability to control the infringement and had a direct financial interest in infringing? Don't you have to meet that standard? I think so, Your Honor. Although secondary liability, I'm sorry, secondary... I'm talking about vicarious infringement first. Right. And then tributary is probably a lesser standard. They're both common law claims, but the DMCA safe harbor is where the defense comes in that we didn't have the right to control, the right and the ability to control. And to answer your question, we think that's not the case. This system doesn't exist in a vacuum. The MMS system was created by these carriers. And at the time that it was, a trade association, which they're all members, specifically said this will result in massive amounts of copyright infringement if you don't, in addition to doing A, B, and C for the functionality of the pipeline, must also include digital rights management, which there are multiple versions of digital rights management and several that would apply in this situation, to make available to a specific copyright holder, if that copyright holder wishes to exercise that right, to prevent, for example, to prevent a specific file from being shared beyond the initial sharing with the intended recipient. That's an item called forward lock. So that, frankly, multiple famous celebrity faux pas would have been avoided if you could have done something like that. But the system doesn't permit that. Another option, perhaps I've created something that is really cool, that a lot of people would like and would share widely, that I might have an interest in being shared beyond my initial sharing, but then every time that a carrier charges its customer 25 cents or 50 cents for sharing that content again and again and again, a quarter or a dime comes back to my pocket. That's called throughput. These are all different approaches to DRM. Sorry, to answer your question, the trade associations way back at the very birth of this technology in 2002 said, you've got to include this DRM. Everything that's going to be passing through this pipeline is going to be subject to copyright. And if even 1% of that is unauthorized, that's $500 million just in 2010 alone compared to 1% of the $56 billion that were sent. So they were on notice in 2002 when trade associations and standard development associations brought their attention. And again in 2007 when the system meteorically expanded to include not just the photos that it had originally included, but also videos and animations and music, which is less and less likely to originate with the sender, more and more likely to be something cute that I found that I want to share with my friends. Well, how do you get around the holding of the district court that the plaintiffs have not alleged that defendants can monitor or control the content that is transmitted by third parties on defendants' networks? Two ways. First and foremost, prior to the motion to dismiss, plaintiffs were not privy to information which they learned after the filings for that motion and the hearing, but before the subsequent motion for fees, unsuccessful motion for fees that the defendants filed after they won their dismissal, which was when the plaintiffs learned of those admonitions by the trade associations and the standard development organization. In other words, that was not knowledge at our fingertips prior to the motion. Is there a post-judgment motion in this case? There was. After the judgment, the defendants moved for fees and were denied. Did you ask to amend your complaint? As a matter of fact, I was retained after that dismissal, but the answer is I believe that prior counsel had filed their opposition to the motion with a cover letter specifying that if anything herein is inadequate, we formally hereby request a move to amend, a leap to amend, and then I think there was language to that effect also in the body of the opposition, although it wasn't a separate motion to amend. However, certainly prejudice is attached, and this Court, if nothing else, could grant us leave to amend now to include that subsequently discovered information. But there's also a second. Well, there is a first amended complaint. I mean, that's the dispositive complaint here. Correct. There has been one amendment already, but a second amendment would include the information in response to your question about the admonitions from the ---- Well, where would I find in the record that you made such a motion? I'm sorry. Which motion? Well, the motion that you ---- To amend. No. That Judge Cormitt asked you about. No, I'm sorry. There was no motion to amend. I thought you said there was no formal motion, but that in effect you would ask for it in the opposition. Correct. And possibly in other places. In other words, you said you would say in the opposition, if you find that it doesn't state a complaint, give us leave to replead. That's my understanding. That's correct. My follow-up is where precisely could I find it, if I look through the record? Precisely in the plaintiff's opposition to the motion to dismiss. Okay. Could you tell me in one minute exactly? Oh, I'm sorry. May I reserve two minutes for that? Just watch the clock, counsel. Thank you. Sorry. You control your own time. Can you exactly describe to me how this mobile-to-mobile device works? You have a description in your brief, but I couldn't follow it, and I'm not an expert. Well, I'm just a dumb lawyer, but I'll do my best. I think you've got a device with some photo, or let's just say a video. I've recorded a video, which I think is hilarious. And by operation of this system, I have the option to send it to my friend, or to as many friends at once as I possibly can. It travels through a conduit, not really a conduit. For conceptual sake, it's a conduit. It goes to my carrier server. I have a Verizon phone. So Verizon's server receives my file that I've created, and it recognizes, well, this is a Verizon file. It comes from such-and-such telephone, so it has these programming parameters. And it's going over here to Heron's friend, Dave, who has an AT&T iPhone, which AT&T has different parameters from Verizon. The iPhone has a different parameter from my flip phone. So it's going to have to make these adjustments. We'll make the adjustment here so that the AT&T server can read it, and we'll compress it for sending over to the AT&T server. And then the AT&T server gets it and expands it and says, well, this came from the Verizon phone. Now it's an AT&T file. It came from a flip phone. Now it's going to an iPhone, so it needs these adjustments. And then it pops up on my friend Dave's phone, perfectly faithful to the content that I sent. So it's not just like a telephone call where it's. . . How does that differ from an e-mail with an attachment? Well, there's a couple of differences. I think the most important one for our purposes here is that this system is not in a vacuum, and it's also not in the untamed wilderness of the Internet. Now there's dozens and dozens of e-mail providers, and some of them have different options. They have different encryption options or any number of different slightly tweaks that they can give, where a specific e-mail provider could specifically prevent a specific sending. Gmail famously put in a bar to sending e-mails after 2 a.m. and make you do math problems to make sure that you're not drunk. So these are all different little options here. By contrast, MMS is just the system. It's completely owned and operated by the appellees. And there's absolutely no restriction. There's no point where you could, if you wanted to, hit the brakes. And it sort of goes back to the question of the use here that is infringing versus the use that's not infringing. If I don't care what happens to my copyright, c'est la vie. But if I do care, it could be my responsibility, provided I have the opportunity, to inform the server not to let this second sending happen or to inform the server that if a second and third and fourth sending happens, I expect 10 cents to come back my way. Does your client have no technological possibility to prevent this from happening? This is a remote analogy, but, for example, Monsanto has genetically engineered corn and so on. And it's very cleverly designed for commercial purposes so that it will grow one crop. And not reproduce. And not reproduce. Yes. So does your client have the technological capacity, or would it be possible if your client chose to develop it, the capacity that after it's moved forward at once, it self-destructs? That's an excellent question. And the answer is no. Because? How do we know that? Because the way something like that would happen, for example, with other technologies, is when the owner of the system produces and makes available to third-party producers what's called a software developer kit, SDK. These SDKs are standard operating procedure for any number of different formats or systems that people are developing things like this for. And producers would have to make and make available such an SDK for MMS. But they haven't. No such SDK exists. And there's simply no way your client can do such a thing unless you get modification of their system? Right. All we would like is to be able to have the opportunity to put these, maybe just a trigger in. And if a copyright owner doesn't include a trigger to protect his copyright into the product, it's his fault. We don't expect them to police everything. We don't expect them to reach that standard that the court in Amazon articulated. What is the trigger? For example, stop forward would be a trigger. I don't want this forwarded a second time. I'm sending it to one friend for him to see only and never to forward again. Stop forward. But why would there be an obligation on AT&T to do that? No. The point is that it's a shared obligation. In fact, the court in Napster specifically said it's not fair that Napster is solely responsible for all this policing. There's a responsibility here also for the producers, and that's what ultimately happened is that the producers had to go through the database as well and then inform Napster and sort of that's where the standard lies today. It is a partnership, but the partnership relies on at least the opportunity. For example, I mentioned the standard technical measure of just letting us know at all that such and such infringement is happening. As it stands, there's no way for us, no absent discovery, which we haven't had yet. We've been dismissed at the pleading stage. There's no way to know whether the system even could let us know this, but it should be at least able to let us know this copyright has been infringed. You've got a minute and ten seconds. You're exactly right. Thank you. I'm going to reserve my time. Thank you, counsel. We'll hear from AT&T. Thank you. Good morning, Your Honors, and may it please the Court. My name is Bruce Joseph. I'm actually here representing T-Mobile, one of the carrier defendants, and I'm responding on behalf of all of the carriers. Very well. I think we can cut through plaintiff's variety of shifting theories with three points that highlight the central flaw in their case. This case concerns a communications network that the carriers developed at their own considerable expense more than ten years ago with a wholly lawful purpose, enabling their users to send pictures that they took with their cell phones. Plaintiffs admit the technology is tremendously beneficial and enormously popular, and in their brief they argue that there are 56 billion messages sent each year. That's more than 150 each month. Second, plaintiffs came along five years later and tried, actually more than five years later, and tried to build a business around exploiting the carriers' networks, but now they want the carriers to change those networks to take special account of their products and to better serve their business. The plaintiffs admit now that for them to obtain the result that they're seeking in this case, this court has to change the established law of vicarious copyright liability, and that's a radical change that they seek. As I understand the law that we've got, you're off the hook under either vicarious or contributory if it will cost you very much or if it's going to be a significant burden on you to do what they want. But if it would be just dirt cheap and you could do it with the flick of a switch, then maybe you have some obligation. How do we know from the pleadings in front of us that you can't do it really, really cheaply? Well, first of all, Your Honor, I don't think the law is quite if we can do it with the flick of a switch. There are two different doctrines here. For contributory infringement, which they haven't alleged and they're not arguing here, there has to be, according to the Napster case and the Amazon.com case, specific knowledge of actual infringements. And if you have that specific knowledge, not to get that specific knowledge, you have to be able to take simple measures to stop it. Now, they're not alleging that. On vicarious, the court was very clear in both Napster and Amazon.com that you've got to take the systems as you find it. Moreover, they haven't alleged simple measures. I mean, what they have done is they've thrown a number of technical terms around and they're throwing more technical terms that they haven't thrown around before in front of this court. They're throwing around a variety of technical terms to say conclusorily, yeah, these are computers, they're smart, you can do it. But what they say we can do has shifted over time. In the complaint, it was, quote, a metadata-based DRM system to enable us to track back to the users. Before the district court, what they argued, and by the way, they never made this argument about retrofitting the system before the district court, so frankly, it's waived, Your Honor. It should be deemed waived. Before the district court, they said we actually had the ability, using our existing billing systems. They don't press that before this court because it's nonsense. Now they've created a new fictitious DRM system, which they call the trigger-based system, where somehow the servers that are part of this conduit aren't able to recover. And DRM means? I'm sorry, Your Honor. Digital rights management. And there are various forms of digital rights management, and none of them look anything like the system that they're arguing before the court. But let me not lose sight of the fact that they didn't make this argument before the district court. And by the way, just to answer one of the questions you had, the request for leave to amend was not a formal request. In the context of their opposition, they filed a paper called a notice of opposition, and in the cover notice they said, and by the way, if you think you're going to dismiss, we should get leave to amend. But then they never argued it. In the entire body of the opposition, there's no argument for leave to amend. There's no argument for a right for leave to amend. There's no proffer of what they would say if they were going to amend. Nothing. Well, they have to know why the judge thought it was in. The complaint didn't suffice. They didn't do it afterward either, Your Honor, after the judge issued his order. And they haven't, frankly, they didn't argue in their brief, in their opening brief before this court, in any way that passes the Christian Legal Society standard, that they should be granted leave to amend. They've waived it on the appeal also. There's no, it's not an argument point. It's not in the summary of argument. There are two mentions in passing in their opening brief. So they didn't preserve it before the district court, and they didn't preserve it here. And if they didn't ask Judge Pragerson, how can he have abused his discretion on a second leave to amend? I think this court has a recent decision that was decided after the briefing, ACWU v. McKim, 682 F. 3841. Is there a 28-J letter filed in respect to that? No, there is not, Your Honor. Well, before you leave the courtroom, please give the deputy clerk the citation in triplicate for the court, and serve the other side as well. Okay, with the citation of the court. Please. Okay. I will, Your Honor. And in that case, the court of appeals said no leave to amend. ACWU has not identified any amendment consistent with the fact she has already alleged that would give her a viable claim. We, therefore, conclude that the district court's decision to dismiss with prejudice was not an abuse of discretion. So it shouldn't be leave to amend here. They didn't preserve it below. They didn't preserve it above. And, moreover, it would be futile anyway, because the system that they're claiming is, frankly, inconsistent with the documents that they're trying to put into the record. Counsel, help me with the physics of all of this. What would it take, from an engineering standpoint, to accomplish what they have in mind, which I gather is put some sort of a bar on a resend or a forwarding of the message? Well, Your Honor. Or the photo, whatever it is. There's nothing in the record. The only thing we have that talk about it are the documents that they've asked you to take judicial notice of. And in each case, nothing is done in the network. Nothing is done in the carrier's network. In those documents that they've asked you to take judicial notice of, this forward lock they're talking about is hard-coded in the cell phone. It's not done in the network. And all of the other systems involve encryption. Now, I don't know. It's not in the record, and I don't know the answer to it. But I believe, based on my understanding of the way DRM works, that they could encrypt an attachment. They could encrypt the product they sell, and then they could work through the various app stores to make an application available to enable the recipient to decrypt and to keep it locked to the cell phone. But, again, none of that's done in the network. The networks handle 150 million-plus messages each and every day. This is not something that can be done within the network. And let's even think about what they're postulating, which they didn't raise below, but the concept of a trigger. What's the trigger going to say? This is copyrighted? Are the copyright owners asserting the copyright? Even the things they sell, their so-called love darts, all of them are intended to be sent at least once. So they're going to be more copyrighted. So even their fictitious system, what do they want to have the servers do, block them? But they sell them for the purpose of sending them. And many of them, and this is alleged in the complaint. I mean, this is in the record. They sell for the purpose of unlimited distributions and with rights to make unlimited distributions. So there is nothing for these triggers to do if these triggers even existed in the first place. And there's nothing in the record to suggest they do exist in the first place. And there are no allegations in the complaint to make it plausible that they exist. Counsel, would you also respond to counsel's argument, if I understood his argument correctly, that this case is controlled by the Napster case and that the same principle should apply here? Well, Your Honor, I think I heard different things from counsel. First, his big opening statement was the DMCA doesn't apply. Well, the DMCA provides an affirmative defense. We're here on a motion to dismiss. And you can look at Ellison versus Robertson and Amazon.com both for that proposition. The DMCA didn't change the underlying doctrines of secondary liability and copyright. The underlying doctrines of secondary liability were set by the Supreme Court in Sony and the Supreme Court in Broxter. And this court applied, indeed, in both Ellison and Amazon.com, Ellison versus Robertson and Amazon.com. This court said the standards for secondary liability in copyright law apply. So the DMCA is a red herring. So now, unfortunately, Your Honor, I fear by having gone off on the DMCA, I lost track of the question I was answering. Well, if I understood his argument, he said the principles that were established in the Napster case compel judgment in his favor. I mean, I've said they don't. I mean, the principles that were established in both the Napster case and in Amazon.com was for purposes of vicarious liability, your right and ability to police your system is cabined by the existing architecture. In fact, there's a specific quote in Napster that says exactly that. Napster and Amazon.com don't have different doctrines of vicarious liability. Amazon.com, which involved Google, just applied the doctrine of vicarious liability that was articulated in Napster. And in Napster, this court made very clear that the standard was your current architecture gives you the practical ability and the right to control infringement. And they have conceded that ours doesn't. That should be the end of the case. Moreover, their request for an expansion would run counter to the teachings of Rockster from the Supreme Court, which recognized that these doctrines of secondary copyright law. First of all, copyright law is wholly statutory. The Supreme Court said that in Sony. And second of all, in both Sony and Rockster, the Supreme Court made very clear you've got to worry about inhibiting technology on the one hand. There's a social interest there. And there is, of course, the social interest in copyright. But you can't expand these secondary liability doctrines in a way that raises concerns because you will inhibit the development of technology. Imagine, if you will, the world that the plaintiffs postulate here. You invest billions of dollars in a network. And sometimes later, somebody who developed a product for your network comes along and says, you've got to change that network. And now you've got to go to court and defend why you haven't done something. Entrepreneurs, companies would not make those investments, or at least they'd certainly be chilled in those investments. And this is a broad policy question. You don't say we want to engage in an ad hoc after the fact balancing. The doctrine is clear. Napster says it. Amazon.com says it. You take the system as it exists. Now, going back, I mean, some of the basic points I was trying to get to at the beginning I've already worked in. Plaintiffs came along more than five years later. They say now change these networks to help us in our business. But I think what's underlying all of this, and this is also clear from a document that the plaintiffs attached to the complaint, they call it Exhibit H. It's in the supplemental record excerpts at 269. The goal here is so that an organization created by a plaintiff's founder could be the toll taker for all MMS to try to capture a share of the carrier's data revenue. And that's not a copyright law. That's not a place where this court should go with copyright law. Indeed, if you look at the initial letters that the plaintiffs sent to the carriers, they're found in supplemental record excerpts 77, 172, and 177. The theory that was articulated was we created these products to be distributed mobile-to-mobile and peer-to-peer, and we did it in anticipation of sharing in the MMS data revenue and the carrier's revenues. Well, they may have anticipated that, but the law gives them no right to that. If there are no further questions, I don't know that I have anything else to say. No further questions, counsel. Mr. Dissner, you have some reserve time. Briefly, the Court asked about the balancing of the hardships, and I think that's a valid approach to this. Of course, we've had zero discovery yet that would really inform that analysis. So amendments, at least for the purpose of discovery, I think, would be justified for that reason. It was alleged that we argued that plaintiffs can encrypt their things in response to the Court's question to me earlier, but I don't have the ability to do that on my telephone. I don't have a fancy, cool phone. MMS works for even the old, first-generation phones, and I can't download an app onto my flip phone to encrypt what I want to send. And finally, Amazon and Napster, they do have one vicarious liability standard at issue, which, as counsel said, the issue here is that it's applied differently because there are two different technologies. And fundamental to this case is that the District Court did not understand that this MMS technology is more aligned with what Napster is and does than what Google is and does and can do. And the image recognition technology mentioned in the Amazon case as, you know, a total pie-in-the-sky pipe dream, A, is even more realistic now than it was then, but B, not even necessary with the contribution per Napster of partnership and policing by the content owners. Thank you, counsel. The case just argued will be submitted for decision.
judges: Korman, O'scannlain, Fletcher